IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRUCE ANDERSEN                    :
                                  :          CIVIL ACTION
        v.                        :
                                  :          NO. 11-2239
MACK TRUCKS, INC., ET AL.         :

**MEMORANDUM**

**SURRICK, J.**                                    **JULY  30  , 2015**

Presently before the Court is Defendants Mack Trucks, Inc. and Volvo Group North America, LLC's Motion for Summary Judgment.  (ECF No. 20.)  For the following reasons, the Motion will be granted.

**I.     BACKGROUND**

**A.     The Parties**

*1.     Plaintiff Bruce Andersen*

Plaintiff Bruce Andersen was born in 1947.  (Andersen Dep. 15, Pl.'s Resp. Ex. A, ECF No. 22-1.)  He graduated from The Pennsylvania State University ("Penn State") in 1970 with a Bachelor of Science in Accounting.  (Andersen Dep. 33.)  After graduation, Plaintiff worked as an Auditor for Johnson Atwater & Company, a public accounting firm located in New York City, for nine months.  (*Id.* at 58-59.)  In 1971, Defendant Mack Trucks, Inc. ("Mack Trucks") hired Plaintiff as a Junior Tax Accountant.  (*Id.* at 64-65.)  In 1976, Plaintiff was promoted to the position of Tax Accountant.  (*Id.* at 67.)  In 1985, he was promoted to the position of Manager of Corporate Payroll.  (*Id.* at 68-69.)  In this position, Plaintiff managed the payroll for all salaried employees and supervised a staff of five employees.  (*Id.* at 69-70.)  In 1991, he was promoted to

the position of Manager of Payroll.  (*Id.* at 71.)

As Manager of Payroll, Plaintiff supervised an additional five employees.  (*Id.* at 71-72.) Plaintiff effectively assumed all payroll duties of Mack Trucks, including supervising the payroll for the bargaining unit, which was comprised of 12,000 employees.  (*Id.* at 71.)  In this capacity, Plaintiff gained experience using collective bargaining agreements.  (*Id.* at 243.)  Specifically, Plaintiff received copies of each new collective bargaining agreement and reviewed the agreements to ensure that the payroll programs "were changed as required to accurately pay people."  (*Id.* at 243-44.)  In addition, Plaintiff was able to use those collective bargaining agreements to respond to issues raised by the bargaining unit employees who worked for him. (*Id.* at 244.)

As Manager of Payroll, Plaintiff sought out and assumed additional responsibilities, including managing building services, office services, food services and travel.  (*Id.* at 73.)  In 1996, Plaintiff attended a twelve-week course at Muhlenberg College and, as a result, became certified as a Professional in Human Resources.  (*Id.* at 35-36.)[1]  In August 1998, Plaintiff took a course called "Effective Interviewing" at the Mack Institute.  (2001 Performance Results 4, Pl.'s Resp. Ex. D, ECF No. 23.)  In 1999, Plaintiff "was personally involved in the renegotiation of the Jackson Cross facilities contract," "attended Labor Relations training for supervisors to improve his skills," and attended a course called "Action Plan Development" at the Mack Institute.  (*Id.*; 2000 Performance Expectation Process 4, Pl.'s Resp. Ex. E.)  In 2000, his job title became

---

[1] The course was "a prep for the Professional and Human Resources Management Certification that was sponsored by the Society of Human Resource Management ["SHRM"]." (Andersen Dep. 35.)  Plaintiff states that his Professional in Human Resources ("PHR") certification is not active today.  (*Id.* at 36.)  Nevertheless, after becoming certified, he continued to attend the local SHRM two-day seminars annually until 2007.  (*Id.* at 49-50.)

Manager of Payroll/Administrative Services.  (2000 Performance Expectation Process 1.)

In 2003, Plaintiff was promoted to a human resources management role, Human Resources Business Partner ("HRBP").  (Andersen Dep. 74, 83.)[2]  At the time that he was promoted, Plaintiff had already performed many of the core responsibilities, and possessed many of the core competencies, of that position.  (Andersen Dep. 84.)  The core responsibilities included providing employment-related advice and counseling to employees and managers, ensuring compliance with employment-related company policy and practice, and adhering to federal and local regulatory guidance.  (*Id.* at 84-86.)[3]  The core competencies included

---

[2] HRBPs were managers who were assigned to provide human resources services to other departments ("Client Groups"), which were "fairly interchangeable" without regard to location. (Sholl Dep. 14, Pl.'s Resp. Ex. K, ECF No. 25; Byrd Dep. 24, Pl.'s Resp. Ex. P, ECF No. 27-2.) Plaintiff, and other HRBPs, had Client Groups that included union-represented employees. (Byrd Dep. 22.)  However, that did not mean that the HRBP worked with those union-represented employees.  (*Id.* at 21.)  Byrd explained that "[i]n our organization[,] an HRBP can represent a client group that has bargaining unit people in it.  I myself have bargaining unit people, but I don't work with them.  I defer to the on-site labor person or one of the other labor people in our group."  (*Id.*)

Excluding Plaintiff, there were three other HRBPs who reported directly to Lesley Billow, the Senior Vice President of Human Resources for Mack Trucks and Volvo Trucks in North America.  (Andersen Dep. 189; Billow Dep. 36, Pl's Resp. Ex. G, ECF No. 29.)  The three other HRBPs were:  Bonnie Miller, born in 1944, Dottie Byrd, born in 1949, and Jill Sholl, born in 1955.  (Miller Dep. 3, Pl.'s Resp. Ex. O, ECF No. 27-1; Byrd Dep. 4; Sholl Dep. 4; *see also* Pl.'s EEOC Aff., Pl.'s Resp. Ex. Z, ECF No. 28.)  Plaintiff was the only male, and was the second oldest, of the four HRBPs.  He was younger only to Miller.  (*Compare* Miller Dep. 3, *with* Andersen Dep. 15.)  Miller and Plaintiff were located in Allentown, Pennsylvania, and Byrd and Sholl were located in Greensboro, North Carolina.  (*See* Apr. 7, 2010 Ltr. 2, Pl.'s Resp. Ex. AA, ECF No. 28 (noting Plaintiff and Miller being located in Allentown, Pennsylvania); Sholl Dep. 11 (testifying about move to Greensboro, North Carolina in September 2002); Billow Dep. 370 (noting Sholl's and Byrd's location in Greensboro).)

[3] When asked to clarify what his understanding was with respect to "federal and local regulatory issues," Plaintiff responded that he "was aware of what those issues were."  (Andersen Dep. 86.)  He explained that the issues entailed "common sense stuff," including "you don't mistreat employees in general" and "[y]ou needed to be able to advise . . . your employees too if they were out of line."  (*Id.* at 86-87.)

-3-

understanding basic business and accounting principles, coaching payroll supervisors in handling

department issues, facilitating change, delegation, directing, inspiring leadership, mentoring,

fostering diversity, and people development.  (Andersen Dep. 87-89.)

As a HRBP, Plaintiff worked with bargaining unit employees and "the bargaining unit

committee people."  (*Id.* at 262-63.)  Specifically, Plaintiff worked as a "mentor" to the employee

activities committee and ensured that "they included their people in [the employee committee]

because it was supposed to be . . . a cross-section of business, and it was activities that

benefited[sic] all employees."  (*Id.* at 263-64.)  While Plaintiff never worked in labor relations,

"sporadically," "there were times when the bargaining unit committee people would come to

[him] and ask [him] a question" when other personnel in the labor relations department were not

available.  (*Id.* at 265.)[4]  From December 2006 to his termination date in 2009, Plaintiff reported

_____

[4] Plaintiff explained that "there were times that the bargaining unit committee people would come to me and ask me a question because [Sherri Palopoli, the Labor Relations Supervisor] wasn't available or whatever.  If I was able to answer, I answered."  (Andersen Dep. 265.)

Sherri Palopoli was a Labor Relations Supervisor who worked in Allentown.  (Billow Dep. 136.)  She was hired by Defendants in 2006, and provided human resources support to the bargaining unit employees.  (Palopoli Dep. 28-30, 84, Pl.'s Resp. Ex. DD, ECF No. 31.)  At the time that she was hired, she was a lawyer but had little, if any, experience in labor relations, in administering collective bargaining agreements, or in human resources.  (*Id.* at 84-86; Byrd 30(b)(6) Dep. 60, Pl.'s Resp. FF, ECF No. 33.)  Palopoli received training for the Labor Relations Supervisor position by reading collective bargaining contracts and receiving on-the-job training, which included reviewing relevant laws and speaking with managers, the union, and other labor relations personnel.  She did not receive formal training.  (Palopoli Dep. 64-65.)  As Labor Relations Supervisor, Palopoli was in charge of two bargaining units and had labor relations and human resources responsibilities for both of these bargaining units.  Such responsibilities included the administration of labor contracts for the local office workers and engineering bargaining units in Allentown, participating in the local contract negotiations and handling liability and "day-to-day HR functions."  (Palopoli Dep. 28-30.)  These functions included payroll, benefit, discipline, hire, fire, and development issues.  (*Id.* at 28.)  Palopoli had daily conversations with union representatives concerning grievances and payroll issues.  (*Id.* at 45-46.)  She participated in the re-negotiation of local contracts, which occurred every three

to Lesley Billow.  (Andersen Dep. 189.)[5]

---

years, and drafted the local contracts.  (*Id.* at 46-49.)  Palopoli received certification as a Professional in Human Resources in 2003 and is pursuing her masters degree in Human Resources at St. Joseph's University.  (*Id.* at 18-19, 111.)  As Labor Relations Manager, she reported to Ed Rosko, a Labor Relations Director located in Greensboro, North Carolina, who reported to Billow.  (Pl.'s EEOC Aff.)  Palopoli was sixteen years younger than Plaintiff.  (Russell HR Form, Pl.'s Resp. Ex. GG, ECF No. 33 (noting that Russell was born in 1963); *see also* Defs.' Resp. To Pl.'s First RFAs No. 14, Pl.'s Resp. Ex. R, ECF No. 32 (admitting that Russell is at least ten years younger than Plaintiff).)

Chris Filopowicz, a contract employee in his mid-twenties, assisted Palopoli with administering labor contracts.  (Palopoli Dep. 77-83; Billow Dep. 139-40.)  In addition to performing administrative work concerning the bargaining units, he responded to employees and managers in the union.  (*Id.* at 80.)  Filopowicz reported to Palopoli, who reported to Rosko.  (Billow Dep. 137.)  Sometime during Billow's tenure as Vice President, Billow referred to Filopowicz as a "cutie."  (*Id.* at 318.)  Sometime between 2009 and 2010, Filopowicz took a full-time Labor Relations Coordinator position.  (Billow Dep. 166, 317.)

While Plaintiff asserts that he had experience working with the bargaining unit employees, he acknowledges that Palopoli worked with the bargaining unit more frequently than he did since it was "100 percent" of her job.  (*Id.* at 265-66.)  Since Palopoli was part of the labor relations negotiations team, and Plaintiff was not, he would receive from Palopoli a copy of the most current contract that resulted from labor relations negotiations.  (*Id.* at 266-67.)  Nevertheless, as a HRBP, Plaintiff did not frequently refer to the contract since "[t]he preferred route would be . . . to go directly to the labor relations department."  (*Id.* at 267-68.)  Plaintiff estimates that when he worked in the payroll department, he looked at the labor contract once a month, when there were questions regarding payroll that pertained to the bargaining unit.  (*Id.* at 389-90.)  When he worked as a HRBP, he examined the contract once a month.  (*Id.* at 390-91.)

---

[5] Billow reported to Denny Slagle, the CEO of Mack Trucks, Inc.  (Heflin 30(b)(6) Dep. 19, Pl.'s Resp. Ex. B, ECF No. 30.)  Slagle reported to Lief Johansson, the former CEO of Volvo Group in Sweden.  (*Id.*)

When Billow first became Senior Vice President in 2006, her department included a Labor Relations Manager, Ted Raftas.  (Raftas Decl. 1, Pl's Resp. Ex. BB, ECF No. 28.)  Raftas was located in Allentown and reported to Rosko.  (*Id.* at 1-2.)  Raftas supervised Palopoli.  (*Id.* at 2.)  In February 2007, Raftas was notified that his position was being eliminated.  (*Id.* at 3.)  He transferred into a labor relations position in another business area that was not headed by Billow.  Raftas remained in Allentown and continued to support and mentor Palopoli until he was terminated by Defendants in June 2009.  (*Id.* at 1, 3-4.)  Raftas was fifty-five-and-a-half years old at the time of termination.  (*Id.* at 1.)  The reason for his termination was a reorganization and reduction in force.  (*Id.*)

    2.  *Defendants Mack Trucks, Inc. and Volvo Group North America, LLC*

Mack Trucks is a manufacturer and distributor of heavy-duty trucks.  (Apr. 7, 2010 Ltr.

2.)  AB Volvo Group is a Swedish corporation.  (*Id.*)  It is a holding company that has corporate

headquarters in Sweden (Volvo Trucks) and in North America (Volvo Trucks North America).

(Heflin 30(b)(6) Dep. 9.)[6]  In 2001, AB Volvo acquired Mack Trucks.  (Apr. 7, 2010 Ltr. 2.)  In

2008, Mack Trucks and Volvo Trucks North America merged into a single entity called Volvo

Trucks North America ("Volvo").  (Heflin 30(b)(6) Dep. 15.)

  **B.**  **STEP, the Economic Downturn and Plaintiff's Termination**

    1.  *STEP*

  In 2008, Defendants announced an organizational restructuring of the truck operations in

North America.  This restructuring was referred to as the STEP Initiative ("STEP").  (*See* Billow

Dep. 78; STEP E-mails, Pl.'s Resp. Ex. X, ECF No. 28.)  In August 2008, Defendants announced

plans to shut down Mack Trucks' headquarters in Allentown, Pennsylvania.  (Apr. 7, 2010 Ltr 2.)

Pursuant to STEP, the headquarters, and most of Mack Trucks's work force, would be relocated

to Greensboro, North Carolina, the location of Volvo's North American headquarters.  (*Id.*)  At

the time that STEP was announced, there were 980 Mack Trucks employees in Allentown.  (*Id.*)

  Defendants initially anticipated that positions would be available for any employee who

was willing to relocate to the Greensboro headquarters.  (*See* Billow Dep. 223 ("[T]he STEP

program itself carried with it the promise for people who were interested in moving to

---

   [6] Defendant Volvo Group North America, LLC was formerly known as Volvo Truck
North America, Inc.

Greensboro to apply for jobs in Greensboro and be hired there.").)[7]  Because most of Plaintiff's

and Palopoli's Client Groups were remaining in Allentown as a result of STEP, Billow chose to

leave both of their positions in Allentown.  (Billow Dep. 110-11, 223.)[8]

Conversely, because most of the Client Groups that Miller was assigned to were moving

to Greensboro as a result of STEP, Billow decided to move Miller's position to Greensboro.

(Billow Dep. 117-21.)  Employees who were asked to relocate because of STEP were given until

the end of 2008 to accept relocation or be terminated.  (*Id.* at 112.)  Miller did not want to move

to Greensboro because of a personal situation—she was the sole caretaker for her mother, who

was ill and could not move.  (*Id.* at 120; Miller Dep. 26; Byrd Dep. 101-02.)[9]  However, Miller

told Billow that if her mother's condition changed, she would reconsider relocating to

Greensboro.  (Miller Dep. 26.)  Defendants did not immediately terminate Miller.  (Billow Dep.

121.)  She was permitted to continue working from Allentown because she had a "special

assignment to support the STEP program to its end."  (*Id.*)[10]  Billow agreed to keep the

---

[7] Of the thirty-five Allentown employees in Billow's Human Resources department, four were not offered relocation.  (Billow Dep. 111.)

[8] Plaintiff did not request a transfer to Greensboro since he thought that the decision for him to stay was "good news."  (Andersen Dep. 249.)

[9] Miller asked Billow why she could not have Plaintiff's position in the test center in Allentown.  (Miller Dep. 144-45.)  Billow explained that Miller could not have that position because Miller's customer base was moving to Greensboro, and giving Plaintiff's position too Miller "wouldn't be fair."  (*Id.* (internal quotation marks omitted); *see also* Billow Dep. 183 ("[A]s part of the STEP program no exceptions were intended to be allowed.  If your job moved, you needed to move, and her job was moving because her client group was relocating to North Carolina.").)

[10] Billow chose Miller to administer STEP "[b]ecause of her demonstrated skill in keeping things organized and following up on issues, and in general handling an extra task when needed."  (Billow Dep. 353-54.)  Billow chose Miller over Plaintiff to administer STEP because

Greensboro opportunity available to Miller until her end date in late 2010.  (Billow Dep. 122.)  In addition, Miller was permitted to continue providing human resources services to her Client Groups that had relocated to Greensboro from Allentown.  (Sholl Dep. 33; Miller Dep. 31-32.)  Miller did not encounter any difficulties in servicing these Greensboro-based Client Groups from Allentown.  (Miller Dep. 33.)[11]  By June 2010, Miller's personal situation had not changed.  (Billow Dep. 130.)  Billow determined that it was time to allow Miller to "close . . . out" STEP and to train a new person to fill that position.  (Id.)  Miller was terminated from Defendants' employment on September 30, 2010.[12]

Janet Russell ultimately took Miller's position.  (Billow Dep. 127.)  Russell was forty-seven years old at the time.  (See Pl.'s Resp. Ex. GG, ECF No. 33-1 (stating 1963 as Russell's year of birth).)  Prior to taking Miller's position, Russell had worked in Defendants' service center and had interacted with Miller's Client Groups.  (Miller Dep. 34-35.)

---

she believed Miller had "superior skills in administering, follow-up, documentation and so on" and "she was better suited for the task because there were many moving parts to it" and she "was better at that sort of thing."  (Id. at 355.)  In addition, Billow felt that Miller "had the superior organizational skills."  (Id. at 360.)  Billow brought up Plaintiff's organizational skills several times when working with him.  (Id.)

[11] Billow testified that when she began contemplating terminating Plaintiff in 2009, she did not offer to Plaintiff the position in Greensboro that Miller refused.  (Billow Dep. 122.)  Billow considered such a possibility "inappropriate" because, at the time, Miller "had an open opportunity to continue to consider that position until her end date" in 2010.  (Id.)

[12] Miller states that her departure from Defendants was not a "voluntary separation."  (Miller Dep. 5.)  She was offered, and accepted, severance in exchange for a release when she left the company.  (Id. at 5-6.)  This departure was characterized as a retirement.  (Id. at 22.)  Miller testified that prior to this September 30, 2010 departure, she had discussed her retirement plans with Billow.  (Id.)  The first time Miller discussed retirement with Billow was before August 2008.  In the discussion, Miller told Billow that she wanted to work until she was sixty-seven.  (Id. at 22-24.)

2.     *The Economic Downturn*

As STEP was being implemented, the economy in 2009 continued to deteriorate, which adversely affected Defendants' business.  (Andersen Dep. 212.)  Sales revenue from Mack Trucks and Volvo North America operations "decreased drastically."  (Apr. 7, 2010 Ltr. 3.)  As a result, Defendants sought to reduce costs further, including the number of employees in its work force.  (Billow Dep. 132, 245.)  Defendant sought to have only 200 employees remain in Allentown.  (Apr. 7, 2010 Ltr. 2.)  In response to a directive to reduce costs further, Billow examined the needs of her Human Resources department and determined that she could reduce an additional position.  (Billow Dep. 132-33, 292-93.)

Billow felt that she had the heaviest staffing, and greatest possibility for reduction, in Allentown because she had fewer employees per HRBP there than in any other location.  (*Id.* at 134-35.)  In making her decision as to how to reduce her force, Billow "look[ed] first at what assignment that person had, and second at what skill sets [she] needed to retain."  (*Id.* at 310.)  At the time that Billow decided to eliminate one position, half of the Allentown employees were represented by a union (bargaining unit employees), and half were not represented by a union (nonbargaining unit employees).  (Billow Dep. 133.)[13]  Billow differentiated Plaintiff's position from Palopoli's by noting that "[t]hey had totally different jobs."  (*Id.* at 161.)[14]  Billow believed

_____

[13] There is mixed testimony concerning whether half, as opposed to "the vast majority," of the remaining employees were members of the bargaining unit.  (*See* Billow Dep. 251-52.) For purposes of this Motion, we construe the facts in favor of Plaintiff, the nonmoving party, and assume that half of the employees were members of the bargaining unit.

[14] Billow explained that "Bruce was an HR business partner.  Sherri was a labor relations supervisor, which was very specialized on the interpretation of our contracts.  To the best of my knowledge, Sherri had the necessary knowledge to continue to perform in her current function." (Billow Dep. 161; *see also id.* at 164-65 (expressing that Plaintiff's experience with labor

that Palopoli "could easily maintain that role and some of the day-to-day issues that would arise

from the non-bargaining unit group" without additional training.  (*Id.* at 133, 178.)[15]  Such day-

to-day issues included general questions and requests from employees concerning vacation,

trainings, career development, job postings, and applications.  (Billow Dep. 257.)  Billow

believed that eliminating Plaintiff's position and transferring his minor day-to-day human

resources duties to Palopoli only required a slight modification of Palopoli's job duties.  (*Id.* at

158-59.)  Her primary responsibility would remain labor relations, and her job title would remain

the same.  (*Id.* at 141.)  Any remaining strategic human resources duties could be transferred to

Sholl, "a much more seasoned" executive-level HRBP who was located in Greensboro.  (*See id.*

at 133-34 (noting that "any necessary escalation of issues were to be escalated to an HR business

_____

relations was "very limited"), 277 ("And the skill set that I believed we needed was the intimate
knowledge of the contracts, which Sherri Palopoli had."), 295 (Billow noting that she did not
believe that Plaintiff "had in-depth knowledge of" specialized labor relations).)

     Billow learned of Palopoli's skills and experience in discussions with Palopoli's
supervisor, Ed Rosko, and Palopoli's manager, William Waters.  (Billow Dep. 147-49, 160.)
Billow learned of Plaintiff's background and experience through discussions with Plaintiff
himself since the time she became his manager in December 2006.  (*Id.* at 36, 150-52; Andersen
Dep. 190-92.)

     [15] In making this determination, Billow did not review Plaintiff's personnel file or his
performance evaluations since she had prior knowledge of his experience and background with
Mack Trucks.  Billow felt that because she had sat down with Plaintiff upon joining the
department to gain understanding of his background so that she "would have an understanding of
what his strengths and contributions could be," she did not need to make further inquiries about
Plaintiff's experience and background or further review his personnel file.  (Billow Dep. 149-53,
172-76.)

     Billow testified that she was not made aware that Plaintiff had taken some training
courses in labor negotiations or that Plaintiff had experience in negotiating contracts.  (*Id.* at
151.)  Billow also testified that she had no "absolute knowledge" of the nature or extent of
Palopoli's involvement in labor negotiations when she made the decision to terminate Plaintiff,
other than that she was involved in general negotiations and preparation work, and how long
Palopoli had been engaged in that sort of work for Defendants.  (Billow Dep. 153, 234.)

partner with more seniority and experience who is already based in Greensboro"), 138-39, 247-48, 256.)

By contrast, Billow believed that it "would have been a difficult task" for Plaintiff to "familiarize himself with the labor contract sufficiently to administer those contracts," in addition to the human resources duties he already had. (Billow Dep. 328-29.) Billow explained that "[l]abor relations is a highly specialized field and [Plaintiff] could have taught himself that, but . . . it would have taken longer than a six-month period to transfer those skills and have him be adequate as a stand-alone in a facility. . . ." (*Id.* at 329.) She believed that Plaintiff "had limited to no experience in administering contracts in the past, so it would have been a stretch not only to learn the content of the protocol and how to administer those contracts." (*Id.*) Billow did not consider terminating anyone other than Plaintiff when she was asked to reduce headcount in early 2009. (*Id.* at 108.)

### 3.    *Plaintiff's Termination and Aftermath*

On April 29, 2009, Defendants notified Plaintiff that he would be terminated. (Apr. 29, 2009 Term. Ltr., Pl.'s Resp. Ex. V, ECF No. 32.) The stated reason for termination was a "workforce reduction caused by adverse economic conditions." (*Id.*; *see also* Andersen Dep. 80.) Although Billow criticized Plaintiff's job performance in that she believed that he "needed to become more organized in delivering [] diversity inclusiveness information," she was generally satisfied with Plaintiff's performance and his job performance did not factor into Billow's decision to eliminate his job. (Andersen Dep. 199; Billow Dep. 163.)

Defendants' Reduction in Force Policy ("RIF Policy") required that managers review their termination decisions with a human resources professional. (RIF Policy 2-3, Pl.'s Resp. Ex.

-11-

RR, ECF No. 34)  Billow believes that she ran her decision to eliminate Plaintiff's position by

Defendants' legal department, which accepted Billow's decision.  (Billow Dep. 286-87, 304-

06.)[16]  Billow did not consult with any HRBP in deciding to terminate Plaintiff.  (Billow Dep.

310.)[17]  Billow did not document the reasons for her decision to select Plaintiff for termination.

(Billow Dep. 265.)[18]

Defendants terminated Plaintiff on October 1, 2009.  (Andersen Dep. 80.)  At that time,

Plaintiff was sixty-two years old.  (*Id.* at 15-16.)  He had worked for Mack Trucks for thirty-eight

years.  (*Id.* at 64-65.)

Prior to his termination, Plaintiff was one of two males employed in Defendants' Human

Resources department.  After Plaintiff's termination, Defendants' Human Resources department

consisted of nine females and one male.  (Answer ¶¶ 34, 40, ECF No. 7.)  By mid-2010, the

---

[16] Defendants, in preparing for a reduction in force, typically obtain an overview of the demographic of the targeted group and worked with managers to make decisions based on business needs of the department and "provide counsel to them regarding making good decisions."  (Byrd 30(b)(6) Dep. 52.)  There was no adverse impact analysis conducted to determine whether the reduction in force in connection with the economic downturn had an adverse impact over individuals above a certain age.  (*Id.* at 52-53.)  In addition, Defendants did not provide Plaintiff—or any of the other employees in Billow's department who were terminated—an age demographic list setting forth the positions and ages of individuals selected, and not selected, for termination.  (Billow Dep. 109-10.)

[17] Troy Heflin, Vice President of Corporate Human Resources, testified that it would have been a "best practice" for Billow to consult with another senior human resources professional in deciding to terminate Plaintiff.  (Heflin 30(b)(6) Dep. 186.)  Billow did not do so.  (*Id.* at 188.)  She did not use an assigned reduction review team, pursuant to the RIF Policy; she considered the team to be herself and legal counsel.  (Billow Dep. 303; *see also* Heflin 30(b)(6) Dep. 148 (noting that it was a "best practice" and "suggest[ed]" "to have a reduction review team").)

[18] The RIF Policy further provides that existing contract positions are required to be eliminated or filled with regular, full-time employees unless no available regular employees have the requisite skill to fill the positions.  (RIF Policy 1-3.)

remaining male was transferred out.  (*See* Billow Dep. 342-43 (testifying that by mid-2010, Rosko "had migrated out of [Billow's] organization and Miss Palopoli had also been transferred out of [Billow's] organization and Mr. Filipowicz was also transferred out of [Billow's organization]" and that by May or June 2010, Billow had no men in her department that directly reported to her).)

Since being terminated by Defendants, Plaintiff has not applied for any labor relations positions.  (Andersen Dep. 125.)  Plaintiff has not listed, and does not list, labor relations experience on his resume because he does not believe that he has "enough labor relations experience to put on a resume" and he had "not had a job, up to this point, that focused on labor relations."  (*Id.* at 125-26.)  Plaintiff has testified that he "never worked in labor relations."  (*Id.* at 265.)  He acknowledges that he did not work with the bargaining unit employees more than Palopoli, who worked with the unit "100 percent" of the time.  (*Id.*)

On February 1, 2010, after Plaintiff had been terminated, Palopoli was promoted to Labor Relations Manager.  (Palopoli Personnel Action Form, Pl.'s Resp. Ex. MM, ECF No. 33; Billow Dep. 188-89.)[19]  This position was not posted.  (Billow Dep. 155.)[20]  Palopoli received a seven

---

[19] Billow "signed off on" this promotion and explained that this was a "slight promotion because of expansion in duties and actually at that time [Palopoli] was taking on more responsibility within the Macungie facility as well."  (Billow Dep. 188-89.)  Billow testified that this "slight promotion" did not positively impact the 2010 Women in Management Report, *see infra*, since "as a supervisor," Palopoli "would have already been included as a manager."  (*Id.* at 189.)

[20] The Volvo Human Resources Policy from 2006, to which Plaintiff cites, states that:

All open jobs must be posted internally unless they fulfill all of the following criteria:

1.  The job does not represent a significant change in scope and responsibilities for a current employee; AND

percent increase in salary as a result of this promotion.  (Palopoli Personnel Action Form.)  On

June 1, 2010, Palopoli became a HRBP.  (Palopoli Personnel Action Form.)[21]  The HRBP

position was not posted.  (Defs.' Resp. To Pl.'s First RFAs No. 21.)  Once Palopoli moved into

the HRBP role, she no longer had labor relations responsibilities.  (Rosko Dep. 43, Pl.'s Resp.

Ex. I, ECF No. 24.)

---

   2. The job is in the same Business Area/Business Unit as said employee; AND
   3. The functional reporting relationship of the job does not change.

   The only exception to the above rule is if a position should become available for
   which a current employee within the same department as the open position is
   qualified and/or has been trained for the position.  This consideration allows for
   internal promotion and succession planning within the department.  This will be done
   at the discretion of the hiring manager with the concurrence of the Human Resources
   Department.

(2006 Volvo Human Resources Policy 2-3, Pl.'s Resp. Ex. NN, ECF No. 33.)
   Billow explained that the position was not posted because "the job content did not change
in a great degree.  It was minimal.  All we did was include the day-to-day HR issues that were
non-bargaining unit.  So it was not a posted job because the primary job content had stayed the
same."  (Billow Dep. 155-56.)

[21] Billow characterized the change in Palopoli's position from Labor Relations Manager
to HRBP as an "organizational reassignment" or "transfer."  (Billow Dep. 186-87.)  Billow
explained that Defendants had reorganized the Macungie and Allentown offices to be one
organization and Palopoli was transferred to this consolidated organization.  (*Id.*)  Defendants
have characterized this change in position as a promotion.  (Defs.' Resp. To Pl.'s First RFAs No.
20.)  Billow testified that she did not sign off on this transfer.  (Billow Dep. 187; *see also*
Palopoli Personnel Action Form (showing signature of Jim Goodell and Terry Martin).)  Miller
testified that she was instructed by Billow to extend the job offer of HRBP to Palopoli.  (Miler
Dep. 72.)
   Plaintiff argues that Palopoli did not meet the minimum qualifications for the HRBP
position.  (Pl's Resp. 27.)  The HRBP Position Profile from February 2004 states that the
minimum experience required is:  "10 years experience in human resources of which at least 7
are in a management role in a facility, regional office or corporate headquarters environment
responsible for some combination of: staffing (focusing on management professionals), retention,
compliance, development, salary administration, and project management."  (HRBP Position
Profile 2, Pl.'s Resp. Ex. OO, ECF No. 33.)

Also in June 2010, while Miller remained employed with Defendants in the Allentown location, Defendants posted for Miller's replacement.  (Billow Dep. 128-29.)  Billow hired Janet Russell, one of the candidates who applied for the position internally,[22] to take Miller's position as a HRBP.  (Billow Dep. 127-28.)  Russell was forty-six at the time of her hire.[23]

### C.    Defendants' Diversity Initiative

From 2006 to 2010, Defendants had a diversity initiative to increase diversity opportunity by twenty-five percent and to increase the number of female managers in Defendants' work force by twenty-five percent.  (*See* 2006-08 HR Strategy, Pl.'s Resp. Ex. J, ECF No. 25 ("*Main Activities* and common *VTC HR Key Objectives for 2006*" including "Active improvement of diversity: *+ 25 % female managers rate by end 2006 (versus baseline 2003)*") (original emphasis); Sholl Dep. 53-63, 73-76; 2007-09 Business Plan, Pl.'s Resp. Ex. L, ECF No. 26; HR Business Plan 2010-12, Pl.'s Resp. Ex. M, ECF No. 26; 2009 Strategic HR Dialogue, Pl.'s Resp. Ex. N, ECF No. 27; Miller Dep. 91-108.)[24]  Billow was aware of the strategic objective from

---

[22] All four candidates for the HRBP position were female.  (Miller Dep. 74-75.)  Miller explained that "[t]he job was posted, so if somebody would have applied, it would have been great if a male would have applied.  But no males applied."  (*Id.* at 75.)

[23] Russell was born in 1963.  (Russell HR Form.)

[24] There is a factual dispute as to whether Defendants were governed by this twenty-five percent target-based diversity initiative at the time that Plaintiff's position was chosen for elimination.  Billow testified that the twenty-five percent target was no longer enforced at Volvo Group.  (Billow Dep. 52.)  She explained that "[t]he diversity targets were cascaded from Volvo Group level down to the different businesses, and at the Volvo Group level they had changed the direction on this.  This was an old target, and Mack Trucks maintained the same wording, and it was no longer valid.  Volvo Group no longer requested we report on it and it was very difficult for me to have two different targets, so I chose the other one.  But this was maintained in the documentation, but we were not measuring or following up diversity opportunity."  (*Id.* at 52-53.)  Sholl testified that she never believed that "it was her objective to increase the representation of women to any certain percentage."  (Sholl Dep. 59.)  For purposes of this

-15-

2007 to 2009 to increase diversity opportunity by twenty-five percent, which included increasing female representation.  This was measured by examining the percentage of women in the work force at a given point and comparing that number to a subsequent point in time to see if there was an increase.  (Billow Dep. 42-46; Sholl Dep. 62-63.)  This measurement was referred to as the Women in Management ("WIM") statistics and was submitted annually to Volvo in Sweden though a WIM Report.  (Defs.' Resp. To Pl.'s First RFAs No. 36; Miller Dep. 111-14; Sholl Dep. 88; Billow Dep. 31-35.)[25]  Individuals at the top of their business areas, such as Billow, were encouraged to improve their diversity metrics from year to year.  (Sholl Dep. 90.)[26]  Plaintiff asserts that Billow personally sought to achieve successful diversity figures.  (Pl.'s Resp. 40.)

Defendants also had a Professional Women's Network ("PWN"), "a network to aid in recruiting, retention and promotion of female managers," in Greensboro.  (PWN Webpage, Pl.'s Resp. Ex. U, ECF No. 32.)  Billow was the founding member, and one of the executive sponsors, of the Steering Committee of that Network.  (Billow Dep. 361-62.)

### D.    Procedural History

On October 21, 2009, Plaintiff filed a Charge of Discrimination with the Equal

---

Motion, we will draw all inferences in favor of Plaintiff, the nonmoving party, and assume that Defendants supported the diversity initiative.

[25] The WIM statistic was a component of a "Balanced Team Indicator" score, which measured success of Defendants' goal of increasing diversity.  (Sholl Dep. 70-71; Diversity KPIs, Pl.'s Resp. Ex. S, ECF No. 32.)

[26] Defendants did not track age demographics in its work force to ensure that older workers were not being discriminated against.  (Sholl Dep. 71-72.)  However, Defendants' Balanced Team Indicator score included an age metric.  (*Id.* at 71.)  This age metric examined whether there was a fifteen-year spread between the oldest worker and the youngest worker.  If a department had one sixty-three year old and 150 twenty-five year olds, the metric would score well.  (*Id.*)

Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations
Commission ("PHRC") complaining of acts of discrimination.  (*See* Compl. ¶ 17 & Ex. 1, ECF
No. 1.)  On March 29, 2011, Plaintiff filed the instant Complaint.  (Compl.)  Plaintiff alleges age
discrimination under the Age Discrimination in Employment Act ("ADEA") and the
Pennsylvania Human Relations Act ("PHRA"), and age and sex discrimination under Title VII
and the PHRA.  (*Id.* at ¶¶ 50-67.)

After discovery, Defendants filed the instant Motion for Summary Judgment.  (Defs.'
Mot., ECF No. 20.)  Defendants contend that neither Plaintiff's gender nor his age was a factor in
Defendants' decision to select him for layoff.  (Defs.' Mem. 28, ECF No. 20-1.)  Plaintiff filed a
Response opposing Defendants' Motion.  (Pl.'s Resp, ECF No. 21.)  Plaintiff contends that
Defendants' Motion should be denied because he has established a *prima facie* case of gender
discrimination and age discrimination, there is sufficient evidence that Defendants' proffered
reason for terminating Plaintiff is pretext for age and gender discrimination, and there are
genuine issues of material fact that must be resolved by a jury.  (*Id.* at 1.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict
for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual
dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing
the district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmovant bears the burden of proof on a particular issue at trial, the movant's initial burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmovant fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Age Discrimination Claims

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).[27]  "Age discrimination may be established by direct or

---

[27] The PHRA also prohibits age discrimination.  It provides:

> It shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . age . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

indirect evidence." *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).   To succeed on an age discrimination claim based on disparate impact, a plaintiff must demonstrate that his age "was the 'but-for' cause of the employer's adverse decision."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *Felix v. Albert Einstein Healthcare Network*, No. 09-3750, 2012 WL 525893, at *5 (E.D. Pa. Feb. 17, 2012).   The plaintiff's age must have "'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).   Since Plaintiff has adduced no direct evidence of age discrimination, we will apply the familiar burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009); *Simpson v. Kay Jewelers*, 142 F.3d 639, 643-44 (3d Cir. 1998).

> 1.   *Step One of the* McDonnell Douglas *Analysis:  Plaintiff Has Not Established a Prima Facie Case of Age Discrimination*

At the first stage of the *McDonnell Douglas* framework, plaintiff has the burden of proving a *prima facie* case of age discrimination by a preponderance of the evidence.  *Ezold v. Wolf, Block, Shorr, and Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992).  The requirement that a plaintiff establish a *prima facie* case of discrimination "'is not intended to be onerous.'"  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (citing *Tex. Dep't of Cmty. Affairs v.*

---

43 Pa. Stat. § 955(a).   "The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively."  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 n.1 (3d Cir. 2005); *see also Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (noting Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts").

*Burdine*, 450 U.S. 248, 253 (1981)).  In order to establish a *prima facie* case, Plaintiff must show

that he:  (1) was over forty years old; (2) was qualified for the position in question; (3) suffered

an adverse employment decision; and (4) was replaced by a sufficiently younger person to permit

an inference of age discrimination.  *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d

Cir. 1995).  Where an employee is terminated during a reduction in force ("RIF"), the plaintiff

must show "that the employer retained a sufficiently younger similarly situated employee."

*Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 301 (3d Cir. 2004); *Anderson v. Consol. Rail

Corp.*, 297 F.3d 242, 250 (3d Cir. 2002).[28]  Otherwise, the ADEA would operate to guarantee "a

protected employee a job at the expense of a sufficiently younger employee."  *Anderson*, 297

F.3d at 250.

To qualify as "similarly situated," there must be evidence that the retained employees had

duties that were comparable to those of the plaintiff.  *Id.*  Courts analyzing the fourth prong must

"look to the job function, level of supervisory responsibility and salary, as well as other factors

relevant to the particular workplace.  This determination requires a court to undertake a

fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible

manner."  *Monaco*, 359 F.3d at 305; *see also Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220,

---

[28] A RIF differs from a decision to fire an employee under ordinary circumstances in that typically, employees are fired for poor performance.  In a RIF, even qualified employees are laid off in order to reduce personnel.  But even in a genuine RIF (one that is motivated, on a programmatic level, by economic concerns), individuals may not be selected for layoff on the basis of age.  Thus, even in a RIF, we use the *McDonnell Douglas* framework to evaluate whether age discrimination exists.  "The employer must have age-neutral reasons for deciding to lay off certain employees, and the employee can challenge these reasons as pretextual."  *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006); *see also Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) ("A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.").

222-23 (3d Cir. 2009) ("While 'similarly situated' does not mean identically situated, the

plaintiff must nevertheless be similar in 'all relevant respects.'") (quoting *Holifield v. Reno*, 115

F.3d 1555, 1562 (11th Cir. 1997)); *Lepore v. Lanvision Sys., Inc.*, 113 F. App'x 449, 452 (3d Cir.

2004) (opining that similarly situated employees "work in the same area in approximately the

same position") (citing *Anderson*, 297 F.3d at 249-50); *Johnson v. Kroger Co.*, 319 F.3d 858,

867 (6th Cir. 2003) ("In the context of personnel actions, the relevant factors for determining

whether employees are similarly situated often include the employees' supervisors, the standards

that the employees had to meet, and the employees' conduct.") (citation omitted); *Milliron v.

Pilot Travel Cntrs, LLC*, No. 06-0262, 2009 WL 2579200, at *10 (W.D. Pa. Aug. 20, 2009)

(citing *Monaco* and collecting other Circuit cases); *Armstead*, 2006 WL 544403, at *5 (holding

that a supervisor was not similarly situated to another supervisor with the same title where the

former could not perform the latter's duties).

     "In order for a plaintiff to satisfy the 'sufficiently younger' standard, . . . there is no

'particular age difference that must be shown,' but while '[d]ifferent courts have held . . . that a

five year difference can be sufficient, . . . a one year difference cannot.'" *Showalter v. Univ. of

Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999) (quoting *Sempier*, 45 F.3d at 729

(citations omitted)).

     Plaintiff asserts that he has made a *prima facie* case of age discrimination.  (Pl.'s Resp.

36.)  He notes, first, that the HRBPs "held precisely the same position as Plaintiff."  (*Id.*)  He

then argues that Plaintiff and Miller were "substantially older" than the other two HRBPs

reporting directly to Billow; and "[a]fter Plaintiff was terminated, but before Miller retired,

Billow promoted Russell, a significantly younger female employee, to take Miller's HRBP

position." (*Id.*)  He points out that Palopoli was also "substantially younger than Plaintiff." (*Id.* at 37.)  Defendant contends that Plaintiff cannot demonstrate that he was qualified for the labor relations position, or that the labor relations position was similar to the HRBP position that Plaintiff had occupied and which was subsequently eliminated.  (Def.'s Mem. 19.)

Plaintiff was sixty-two years old when he was terminated from Defendants' employment on October 1, 2009.  Therefore, elements (1) and (3) have been met.  At the time that Plaintiff was terminated, three other HRBPs reported directly to Billow:  Miller, Byrd, and Sholl. Plaintiff and Miller were located in Allentown, and Byrd and Sholl were located in Greensboro. Therefore, of the four HRBPs reporting directly to Billow, only Miller was similarly situated to Plaintiff.  In 2009, the year when Plaintiff was laid off, Miller was sixty-five years old.  She was three years older than Plaintiff.  Therefore, with respect to Miller, Plaintiff cannot meet element (4).

To the extent that Plaintiff argues that he and Palopoli were similarly situated, that argument fails.  On the one hand, Palopoli and Plaintiff both were located in Allentown. Palopoli is sixteen years younger than Plaintiff.  *See Steward v. Sears Roebuck & Co.*, 231 F. App'x 201, 209 (3d Cir. 2007) ("We decline to adopt a brightline rule that a 6.75 year average age difference between a plaintiff and those who assume his job duties is, as a matter of law, insufficient to give rise to an inference of age discrimination."); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 699 (3d Cir. 1995) ("It is clear that here, the eight year difference between [the plaintiff] and the successful candidate . . . could support a finding that [the successful candidate] was sufficiently younger than [the plaintiff] to permit an inference of age discrimination.") (citation and internal quotation marks omitted); *Sempier*, 45 F.3d at 729-30 (concluding four and

ten year age differences were sufficient to support a prima facie case of age discrimination).  On the other hand, Plaintiff reported directly to Billow and Palopoli reported directly to Rosko.[29]  In addition, their job functions were different.  Plaintiff concedes that Palopoli worked with the bargaining unit more frequently than he did since it was "100 percent" of her job.  (Andersen Dep. 265-66.)  Palopoli was part of the labor relations negotiations team, and Plaintiff was not. (*Id.* at 266-67.)  Plaintiff admits that he didn't have "a job, up to [the point when he was laid off by Defendants], that focused on labor relations."  (*Id.* at 125-26.)  He stated that he "never worked in labor relations."  (*Id.* at 265.)  Because he does not believe that he has "enough labor relations experience," he has not listed such experience on his resume.  Thus, with respect to Palopoli, Plaintiff cannot meet element (4).  *See Armstead*, 2006 WL 544403, at *5 (holding that a supervisor was not similarly situated to another supervisor with the same title where the former could not perform the latter's duties).  Plaintiff has not made a *prima facie* case of age discrimination.

    2.    *Step Two of the* McDonnell Douglas *Analysis:  Defendants Have Established a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff*

Even if Plaintiff had made a *prima facie* case of age discrimination, Defendants have established a legitimate, nondiscriminatory reason for terminating him.  Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show that there was a legitimate, nondiscriminatory reason for the adverse employment decision.  *Showalter*, 190 F.3d

---

[29] Although Rosko reported directly to Billow, the fact that Plaintiff and Palopoli had different direct supervisors shows that Plaintiff's function primarily concerned general human resources duties, whereas Palopoli's function primarily concerned labor relations duties.  *See Seiple v. Friendly Ice Cream Corp.*, No. 08-4201, 2009 WL 2776609, at *7 (E.D. Pa. Aug. 31, 2009) (no *prima facie* case established where two individuals had different direct supervisors).

at 235.  At this stage, "the burden of production (but not the burden of persuasion) shifts to the defendant . . . ."  *Mascioli v. Arby's Rest. Grp.*, 610 F. Supp. 2d 419, 433 (W.D. Pa. 2009).  The burden on the defendant is "relatively light" and the defendant can satisfy this burden by "introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  *Id.* (quoting *Fuentes*, 32 F.3d at 763).

Defendants contend that their reason for terminating Plaintiff was legitimate and nondiscriminatory.  They explain that Defendants "were faced with a very challenging and difficult business environment, which resulted in drastic, cost-cutting measures," and that "Plaintiff's position was eliminated in connection with a necessary RIF."  (Defs.' Mem. 19.)  The termination of an employee in connection with a financially necessary RIF constitutes a legitimate, nondiscriminatory reason for the termination.  *See, e.g.*, *Atchison v. Sears*, 666 F. Supp. 2d 477, 494 (E.D. Pa. 2009); *Laukagalis v. Unisys Corp.*, No. 07-4754, 2008 WL 4601935, at *4-5 (E.D. Pa. Oct. 15, 2008); *Smith v. Thomas Jefferson Univ.*, No. 05-2834, 2006 WL 1887984, at *4 (E.D. Pa. June 29, 2006).

       3.     *Step Three of the* McDonnell Douglas *Analysis:  Defendants' Proffered Reason For Plaintiff's Termination Is Not Pretext for Age Discrimination*

If a defendant succeeds at this second step, the third step of the *McDonnell Douglas* framework requires the plaintiff to show that the employer's proffered legitimate, non-discriminatory reason for the adverse employment action is pretext for discrimination.  *Burdine*, 450 U.S. at 252.  To show pretext, the plaintiff must present "some evidence . . . from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate

-24-

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

> With respect to prong (1), to discredit the employer's proffered reason, a plaintiff
>
> cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence.

*Fuentes*, 32 F.3d at 765. "As another court of appeals has put it, 'federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)); *see also Coulton v. Univ. of Pa.*, 237 F. App'x 741, 747 (3d Cir. 2007) (holding that "it is not enough to show that the employer made a wrong or mistaken decision"). With respect to prong (2) of the pretext analysis, a plaintiff must provide evidence that allows the fact finder to infer that discrimination was "the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176; *City of Allentown*, 589 F.3d at 690-91; *Boyd v. Federated Investors, Inc.*, No. 10-1460, 2012 WL 94484, at *5 (W.D. Pa. Jan. 11, 2012); *Homel v. Centennial Sch. Dist.*, 836 F. Supp. 2d 304, 317 (E.D. Pa. 2011).

> Plaintiff argues that Defendants' proffered reason for terminating Plaintiff is pretextual, as evidenced by several facts. First, he points out that "[o]ther than Miller, Plaintiff was the oldest member of the Department and the only one terminated." (Pl.'s Resp. 46.) This does not

demonstrate pretext.  In *D'Amico v. Pulte Homes, Inc.*, No. 08-1099, 2009 WL 792344 (E.D. Pa. Mar. 23, 2009), the plaintiff argued that the supervisor's discriminatory animus against older employees was demonstrated by "his exclusive selection of individuals over 40 years of age for the RIF."  *Id.* at 4.  In that case, the supervisor chose to retain two individuals over the age of 40. The Court held that "[w]ithout more, [the supervisor's] selection of individuals for the RIF is insufficient to create a question of fact regarding whether an 'invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Id.* (citation omitted).  In this case, Billow chose to retain several individuals who were over the age of forty.  Indeed, Byrd, one of the HRBPs who was retained, was only two years younger than Plaintiff.  Sholl, the youngest of the four HRBPs, was fifty-four years old at the time Plaintiff was laid off.  Accordingly, the fact that Plaintiff was the second-oldest member of Billow's department to be laid off does not support pretext.

As evidence of pretext, Plaintiff points to a "woefully deficient method of assessing Defendants' success regarding age diversity" (Pl.'s Resp. 46 at n.53) and Defendants' failure to "perform any adverse impact of the RIF with respect to age" (*id.* at 47-78 at n.55).  While such evidence may be used to establish a *prima facie* case of age discrimination, it does not rebut Defendants' articulated reason for terminating Plaintiff.  Plaintiff "cannot simply rely on the facts that support [his] prima *facie* case to rebut [Defendants'] articulated reason, and assert that [Defendants'] intent is a question of fact that must be determined by a jury."  *Fieni v. Franciscan Care Cntr.*,  No. 09-5587, 2011 WL 4543996, at *9 (E.D. Pa. Sept. 30, 2011).

Plaintiff claims that pretext is evidenced by the fact that (1) Defendants failed to offer Plaintiff Miller's HRBP position after she refused relocation to Greensboro and subsequently

-26-

filled that position with a "substantially younger female," Russell (*id.* at 47), and that (2) Defendants failed to terminate Filopowicz, a contract employee in his twenties, before terminating Plaintiff, in violation of their RIF policy, and then subsequently made Filopowicz a full-time employee a few months after Plaintiff's termination (*id.* at 47). These are mere challenges to Defendants' business decisions concerning the RIF and do not show that the decision to terminate Plaintiff was motivated by age discrimination. We are not permitted to involve ourselves in the subjective business decisions of the employer or set employment standards for the employer unless there is evidence of discrimination. *Ezold*, 983 F.2d at 531. Here, there is none.

The record shows that the economy deteriorated in 2009. Billow received a directive to reduce her department's headcount. She decided to eliminate one position in Allentown. Miller was not immediately eliminated at the time because she was still in the process of administering STEP. A substantial number of the Allentown employees who remained after STEP were represented by a union and required specialized labor relations support. Palopoli had more labor relations experience than Plaintiff. Accordingly, Billow decided to eliminate Plaintiff's position. The later hiring of Russell is separate and apart from Plaintiff's termination. With respect to Filopowicz, there is no evidence that Defendants' retention of that employee, and their decision not to replace Filopowicz with Plaintiff, were motivated by age. Filopowicz assisted Palopoli with administering labor contracts. In addition to performing administrative work concerning the bargaining units, he responded to employees and managers in the union. Filopowicz reported to Palopoli. Since Palopoli would continue her labor relations work, there is nothing invidious about a decision to retain Filopowicz to assist Palopoli. Moreoever, Filopowicz and Plaintiff had

different job functions.  There is nothing indicating that Filopowicz's younger age is why he was

retained and Plaintiff was terminated.  While we do not believe that Defendants violated their

RIF Policy, a mere violation of policy alone cannot constitute evidence of pretext.  *See Russell v.*

*Vanguard Grp.*, No. 04-3269, 2006 WL 2077010, at *3 (E.D. Pa. July 24, 2006) (holding that

while an employer's violation of its own policy "might afford evidence that improper purposes

are playing a role," such a violation does not necessarily constitute evidence of pretext) (internal

quotation marks and citation omitted).  Filopowicz's later promotion to a full-time Labor

Relations Coordinator position in 2009 to 2010 is separate and apart from Plaintiff's

termination.[30]

Finally, Plaintiff claims that Defendants deliberately staggered the termination dates of its

employees in connection with the RIF and failed to provide Plaintiff with an age demographic

list, or a list of criteria used to select him for termination, at the time he was terminated, in

violation of the Older Worker Benefits Protection Act ("OWBPA").  (Pl.'s Resp. 47-48.)  There

is no evidence of such deliberate effort.  While Plaintiff cites the Volvo Human Resources

Policies and Procedures in the United States from the years 2008 and 2009, this document does

not show any deliberate staggering of termination dates.  It is not the Court's job to search

through the record in an attempt to find evidence in support of a nonmoving party's argument.

---

[30] Plaintiff notes that Billow, at one point in time, called Filopowicz a "cutie."  One passing comment is insufficient to conclude that Plaintiff's termination was motivated by age discrimination. *See Shaw v. Pittsburgh Bd. of Educ.*, No. 07-1183, 2009 WL 86709, at *5 (W.D. Pa. Jan. 12, 2009) (in gender discrimination case, nine comments, including "token male" and "boy," made over the course of ten years, were insufficient to conclude adverse action was motivated by gender bias); *see also Lewis v. Bayer Corp.*, No. 03-4403, 2005 WL 2893869, at *5 (N.D. Cal. Nov. 2, 2005) (holding that ambiguous stray remarks cannot establish discriminatory bias).

*See United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510-11 (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")); *see also Perkins v. City of Elizabeth*, No. 05-3786, 2009 WL 5178385, at *3 (D.N.J. Dec. 30, 2009) ("It is not the Court's responsibility to sift through Plaintiff's submission in an attempt to find evidence which supports or provides better context for each of Plaintiff's allegations."); *Hunter v. Stouffer Equip. Co.*, No. 08-1270, 2009 WL 2982668, at *4 n.10 (M.D. Pa. Sept. 14, 2009) (stating that courts will not "dredge through record evidence to find questions of material fact").

In sum, with respect to the age discrimination claims, Plaintiff has not demonstrated any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions [such] that a reasonable factfinder could rationally find them unworthy of credence." *Keller*, 130 F.3d at 1109. Moreover, Plaintiff has not adduced evidence that age was the but-for cause of the decision to terminate Plaintiff. Defendants retain discretion to terminate employees as part of a RIF so long as there is no discriminatory animus. Here, there is no showing that "age discrimination was *the cause* of the adverse employment action by showing that no other believable reason for the action exists." *See Homel*, 836 F. Supp. 2d at 318 (emphasis added). The "essence of a [reduction-in-force] is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired." *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988); *Laukagalis*, 2008 WL 4601935, at *6. Unfortunately, Plaintiff was one of those employees. Accordingly, Defendants' Motion as to Plaintiff's age discrimination claims will be granted.

-29-

B.      **Gender Discrimination Claims**

Title VII makes it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. Unlike ADEA plaintiffs,

> [a] Title VII plaintiff may state a claim for discrimination under either the pretext theory set forth in *McDonnell Douglas* . . . or the mixed-motive theory set forth in *Price Waterhouse v. Hopkins* . . . [,] under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons.

*Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008).

Under a mixed-motives inquiry, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that ' . . . sex . . . was a motivating factor for any employment practice.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003). If a plaintiff makes that showing, the employer can put forth an affirmative defense to "demonstrate that it would have taken the same action in the absence of the impermissible motivating factor." *Id.* at 95 (alterations omitted). "If proven, this defense limits the plaintiff's relief to injunctive relief, attorney's fees, and costs." *Makky*, 541 F.3d at 213. While a mixed-motives analysis does not require the plaintiff to put forward direct evidence, *Desert Palace*, 539 U.S. at 92, the plaintiff generally presents evidence of "'conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Stackhouse v. Pa. State Police*, No. 01-2223, 2006 WL 680871, at *4 (M.D. Pa. Mar. 14, 2006) (quoting *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 470 (3d Cir. 1993), overruled on other grounds by *Miller v. CIGNA Corp.*, 47 F.3d 586 (3d Cir.

1995)).  Since Plaintiff has adduced no direct evidence showing conduct or statements reflecting discriminatory attitude toward his gender, we will analyze Plaintiff's gender discrimination claims using the *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000).[31]

> 1. *Step One of the* Iadimarco *Analysis:  Plaintiff Has Established a* Prima Facie *Case of Reverse Gender Discrimination*

Gender discrimination against males is commonly referred to as reverse discrimination. In cases involving reverse discrimination, the Third Circuit has articulated a modified burden shifting analysis that differs from the usual test for gender discrimination enunciated by the Supreme Court in *McDonnell Douglas*.[32]  *See Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999). Under *Iadimarco*, the plaintiff must establish a *prima facie* case by presenting sufficient evidence to allow a fact finder to conclude that the defendant treated some people less favorably than

---

[31] The PHRA provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . sex . . . of any individual . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract."  43 P.S. § 955(a).  Claims under the PHRA are interpreted coextensively with Title VII claims.  *Kelly*, 94 F.3d at 105.

[32] In order to establish a *prima facie* case for a Title VII employment discrimination claim where there is no direct evidence of discrimination, the plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the job and satisfied his employer's expectations; (3) he was dismissed despite his satisfactory performance; and (4) after his dismissal, the job remained open and the employer sought applicants for it. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts to the defendant to show that it took the adverse employment action against the plaintiff for a legitimate, nondiscriminatory reason.  *Id.*  Finally, the plaintiff has an opportunity to demonstrate that the legitimate and nondiscriminatory reasons offered by the defendant are only a pretext for discrimination.  *Id.*  We note that both parties have used the *McDonnell Douglas* standard, not the *Iadimarco* standard.

-31-

others based on gender.[33]  "There is a low bar for establishing a *prima facie* case of employment

discrimination."  *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 (3d. Cir. 2006)

(citations omitted); *see also Ezold*, 983 F.2d at 523 (3d Cir. 1992) (stating "the prima facie case

is easily made out").  However, "'a plaintiff whose employment position is eliminated in a

corporate reorganization or work force reduction carries a heavier burden in supporting charges

of discrimination than does an employee discharged for other reasons.'"  *Hook v. Ernst & Young*,

28 F.3d 366, 375 (3d Cir. 1994) (quoting *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510,

517 (6th Cir. 1991)).

Plaintiff asserts that a *prima facie* case of reverse discrimination exists since "Defendants

retained Miller, Sholl and Byrd, all of whom were female HRBPs who held precisely the same

position as Plaintiff."  (Pl.'s Resp. 36.)  In addition, Plaintiff argues that Miller was treated more

favorably than Plaintiff since she was permitted to remain with Defendants until 2010 after she

notified them that she would not relocate to Greensboro.  (*Id.*)  Plaintiff also argues that gender

discrimination is shown by the fact that Defendants chose Palopoli, a female employee, over him

for the remaining Allentown-based position.  (*Id.* at 36-37.)

For the reasons set forth *supra*, Palopoli was not similarly situated to Plaintiff, and of the

four HRBPs who reported to Billow, only Miller was similarly situated to Plaintiff.  While there

---

[33] "[A] plaintiff who brings a 'reverse discrimination' suit under Title VII should be able
to establish a *prima facie* case in the absence of direct evidence of discrimination by presenting
sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the
circumstances) that the defendant treated plaintiff 'less favorably than others because of his race,
color, religion, sex, or national origin.'"  *Iadimarco*, 190 F.3d at 163 (quoting *Furnco
Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

is evidence that Billow did not discriminate on the basis of gender,[34] there is also testimony that

the HRBP roles were substantially interchangeable.  Moreover, Billow chose Miller, and not

Plaintiff, to administer STEP "[b]ecause of her demonstrated skill in keeping things organized

and following up on issues, and in general handling an extra task when needed" and her "superior

organizational skills."  (Billow Dep. 353-55.)  As a result, Miller remained employed by

Defendants until 2010 while Plaintiff was terminated in 2009.  This may give rise to an inference

that Miller received more favorable treatment because of her gender.  Furthermore, Billow's

choice to have Miller administer STEP based on her superior organizational skills involved a

subjective inquiry.  The Third Circuit has stated that "'while objective job qualifications should

be considered in evaluating the plaintiff's prima facie case, the question of whether an employee

possesses a subjective quality, such as leadership or management skill, is better left to'

consideration of whether the employer's nondiscriminatory reason for discharge is pretext."

*Sempier*, 45 F.3d at 729 (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)).

"Thus, to deny the plaintiff an opportunity to move beyond the initial stage of establishing a

*prima facie* case because he has failed to introduce evidence showing he possesses certain

subjective qualities would improperly prevent the court from examining the criteria to determine

whether their use was mere pretext."  *Id.* (internal quotation marks and citation omitted).

Accordingly, we conclude that Plaintiff has established a *prima facie* case of reverse gender

discrimination and will continue with the *Iadimarco* analysis.

---

[34] *See supra* at n.9.

    2.     *Step Two of the* Iadimarco *Analysis:  Defendants Have Established a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff*

Once the plaintiff has established a *prima facie* case of reverse discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action.  *See Corbett v. Sealy, Inc.*, 135 F. App'x 506, 509 (3d Cir. 2005) (explaining *Iadimarco* standard); *Medcalf v. Trustees of Univ. of Pa.*, 71 F. App'x 924, 927 (3d Cir. 2003) (same).  For the reasons discussed *supra*, Defendants have set forth a legitimate, non-discriminatory reason for their decision to terminate Plaintiff.

    3.     *Step Three of the* Iadimarco *Analysis:  Defendants' Proffered Reason For Plaintiff's Termination Is Not Pretext For Gender Discrimination*

At the final step, the burden shifts back to plaintiff to show the defendant's reason for the action was pretextual.  *Corbett*, 135 F. App'x at 509; *Medcalf*, 71 F. App'x at 927.  Plaintiff asserts that Defendants' proffered reason for terminating Plaintiff "fails to explain why Plaintiff was selected for termination while all of Billow's female staff, including not only Palopoli, but also Miller, Sholl and Byrd, were retained."  (Pl.'s Resp. 39.)

Plaintiff argues that Defendants' proffered reason for Plaintiff's termination is pretextual. He argues that gender discrimination is evidenced by the "unfair" promotion of Palopoli, followed by Russell's replacement of Miller, both of which show that Billow was "motivated by a desire to retain a female employee, and not because the position itself was indispensable."  (*Id.* at 42.)[35]  He also notes that he was generally familiar with labor contracts and "could have gotten

---

    [35] Plaintiff explains that "Palopoli was promoted to a manager position, without meeting the minimum job qualifications, and without any job posting, contrary to Defendants' policy and practice.  A few months later, Palopoli was promoted to an HRBP position, again, without meeting the minimum job qualifications and without any job posting."  (Pl.'s Resp. 41.)  "At approximately the same time, Billow posted for an HRBP position in Greensboro to replace

up to speed on the current contracts by reading them," or alternatively, "other labor relations

personnel in the Lehigh Valley besides Palopoli could have provided labor relations support as

needed." (Pl.'s Resp. 42.)[36]  He claims that gender discrimination is demonstrated by

Defendants' termination of Plaintiff in lieu of Miller.[37]  Finally, Plaintiff argues that Billow's

failure to investigate into Plaintiff's skill sets prior to terminating him, and the fact that Plaintiff

"was by far a more experienced human resources professional than Palopoli," demonstrate

gender discrimination.  (Pl.'s Resp. 43.)  However, these arguments attack Defendants'—or

specifically, Billow's—business judgment.  They do not link the decision to terminate Plaintiff to

gender bias.  *See Thomas Jefferson Univ.*, 2006 WL 1887984, at *5 (finding that plaintiff's

efforts to establish that she was qualified to hold a position did not undermine defendant's

contention that a concern for quality and continuity of patient care was its motive in selecting

plaintiff's position for termination).  Defendants' failure to investigate further into his and

---

Miller, even though Miller was still with the company.  Russell was selected from an all-female candidate slate, with no effort made to diversify the slate to include a male candidate, as would have been required had the gender composition been reversed." (*Id.*)  Within eight months of Plaintiff's termination, "Billow had rid herself of all male managers in her department, and had promoted two women into management positions." (*Id.*)

   In addition to arguing that gender discrimination was more likely than not a motivating or determinative cause of Plaintiff's termination, Plaintiff also argues that this evidence shows contradictions and inconsistencies in Defendants' testimony such that the Court should not believe the employer's proffered reason for Plaintiff's termination.  (*Id.* at n.49).

   [36] It is undisputed that a law degree was not required for the labor relations position. (*See* Billow Dep. 145-46; Byrd 30(b)(6) Dep. 58.)

   [37] Plaintiff explains that Defendants' choice to retain Miller over him shows that Defendants could not have been concerned with costs since it would have been more cost effective to terminate Miller and assign to Plaintiff the administration of STEP. (Pl.'s Resp. 45.) By contrast, Ted Raftas was terminated while his relocation offer was pending. (*Id.*; *see also* Raftas Decl.)

Palopoli's skill sets does not create an issue of material fact.  *See Seiple*, 2009 WL 2776609, at

*9 (holding that even if manager had based his decision to terminate plaintiff on inaccurate

information, this does not prove pretext); *Thomas Jefferson Univ.*, 2006 WL 1887984, at *6

(rejecting similar argument by plaintiff, explaining that plaintiff did not have experience working

a certain area and she would have required a week's worth of training to obtain that familiarity,

and holding that defendant's failure to include a more detailed explanation of why she chose to

terminate plaintiff in her memo to the human resources department was not evidence that the

decision did not comply with the defendant's RIF policy).  While Plaintiff may have been able to

gain the requisite labor relations experience by reading labor contracts and undergoing further

training, Billow decided to retain Palopoli because she already had the necessary labor relations

experience and did not need additional training.  It is not the Court's role to second-guess

business decisions where there is no evidence of discriminatory animus.  Here, there is none.

Similarly, the fact that Defendants retained Miller until 2010 to administer STEP while

eliminating Plaintiff's position in 2009 was a logical business decision.  It does not reveal any

inconsistencies or discriminatory animus that would compel us to second-guess Defendants'

rationale for terminating Plaintiff; it does not suggest gender discrimination.  *See Shaw v.

Pittsburgh Bd. of Public Educ.*, No. 07-1183, 2009 WL 86709, at *5 (W.D. Pa. Jan. 12, 2009)

("[T]he fact that a woman received a more desirable assignment instead of a man does not, alone,

establish gender discrimination."); *see also Paich v. Nike, Inc.*, No. 06-1442, 2008 WL 696915,

at *8 (W.D. Pa. Mar. 12, 2008) (noting that "[i]n a discrimination case, the issue before the court

is not the fairness of an employer's decision to terminate the plaintiff, but whether the record

raises an issue of fact as to whether the decision was motivated by discriminatory animus")

(citing *Brokenbaugh v. Exel Logistics N.A.*, Inc., 174 F. App'x 39, 45 (3d Cir. 2006)).

To show pretext, Plaintiff points to inconsistencies in Billow's explanation for her decision to terminate Plaintiff.  (Pl.'s Resp. 41-42.)  These inconsistencies are:  (1) Billow's testimony that she considered client assignments, geographic location, and job function when determining which position to eliminate, in contrast with testimony that client group assignments and geographic location were interchangeable; and (2) Billow's testimony that the "vast majority" of employees remaining in Allentown after STEP were bargaining unit employees, in contrast with a prior statement that fifty percent of the remaining Allentown employees were bargaining unit employees.  (*Id.* at 42.)  However, the fact that Client Group and geographic assignments may be interchangeable does not contradict Billow's testimony that she considered those factors, as well as job function, when deciding how to reduce headcount in her department.  Moreover, Billow's testimony with regard to the composition of employees remaining in Allentown after STEP appears to be more of a minor miscalculation rather than a material equivocation:

> Q.  Could you turn to Page 3 and look at the second full paragraph for me, please.  The second sentence of that, the sentence the beginning of the paragraph reads, "Billow considered Andersen and labor relations manager Sherri Palopoli for the remaining Allentown position.  Approximately half of the 200 employees remaining in Allentown were members of the United Auto Workers, UAW, office and engineering bargaining units.  Is that accurate?
>
> A.  It could be, but I don't know that.  Approximately half versus the 60 percent, we're talking about a ten percent difference, which might be 10 or 20 people.
>
> Q.  Well, if I recall, your testimony was that, quote, the vast majority, closed quote, [are] bargaining unit people.  Now which is accurate?  Because half is not vast majority.
>
> A.  I'd say it's better than half, but I don't know those numbers without looking at

a document to show you. This was probably an estimation, but I'd say it's better than half.

(Billow Dep. 251-52.) This does not discredit Defendants' proffered reason for terminating Plaintiff. *See Seiple*, 2009 WL 2776609, at *8.

Plaintiff points to circumstantial evidence of gender discrimination, including Defendants' diversity initiative, something of which Billow was a "champion" (Pl.'s Resp. 40);[38] and the fact that prior to Plaintiff's termination, Billow's department was all female except for Plaintiff and Rosko (*id.* at 41).) The diversity initiative from 2006 to 2010 sought to increase diversity opportunity by twenty-five percent and to increase the number of female managers in Defendants' workforce by twenty-five percent. This was measured by examining the percentage of women in the work force at a given point and comparing that number to a subsequent point in time to see if there was an increase. Although Billow was aware of this diversity initiative, such awareness does not prove that Billow eliminated Plaintiff's position because of his gender. *See Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (holding that while decision maker was "philosophically favorable to the hiring of minorities," that did not prove that his particular decision was made for discriminatory reasons); *Cerrato v. San Francisco Cmty. College Dist.*, 26 F.3d 968, 976 (9th Cir. 1994) ("[T]he mere fact of an affirmative action plan's existence is not relevant to proving discrimination unless the employer acted pursuant to the plan."). There is no evidence of any directive, or any conduct, wherein Defendants took less qualified candidates over more qualified candidates because of their gender. Moreover, since there is nothing in the record

---

[38] Plaintiff claims that the diversity initiative, in conjunction with the fact that Billow was a founding member of an employee-initiated networking group whose mission was to promote and retain female employees, shows that "[a] reasonable inference can be drawn . . . that Billow's decision was tainted by gender bias." (Pl.'s Resp. 40-41.)

-38-

indicating that Defendants' proffered reason for eliminating Plaintiff's position was pretextual, the mere fact that the ratio of males to females was low in Billow's small human resources department cannot demonstrate pretext.

Plaintiff asserts that Raftas' declaration is evidence of gender discrimination.  In the declaration, Raftas states that based upon his interactions with Billow and others in the work place, "Billow had a negative attitude toward older males." (Raftas Decl. 4.)[39]  "[T]he testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990); *see also Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1149 (10th Cir. 1999). Nevertheless, Raftas' declaration does not support Plaintiff's pretext because Raftas had no direct knowledge of Defendants' decision to terminate Plaintiff.  Raftas' statements and beliefs do not link Plaintiff's termination to gender discrimination.  *See Foxworth v. Am. Bible Soc.*, No. 03-3005, 2005 WL 1837504, at *9 (S.D.N.Y. July 28, 2005) (finding no pretext where plaintiff submitted affidavits of two former employees since the employees had no direct knowledge of

---

[39] Raftas's basis for this opinion is as follows:

> Ms. Billow ignored me, even though I was the highest ranking Labor Relations HR person in Allentown.  When she would come on-site, she would meet with Bonnie Miller and Sherri Palopoli but would not include me.  Ms. Billow would typically bypass me and interface directly with Ms. Palopoli, even when Ms. Palopoli was my subordinate.  Ms. Billow didn't respond to my emails either.  For example, when Ms. Billow first came on board, I spoke to her regarding staffing issues and in particular, the need to make the temp position in my group permanent.  She never bothered to respond and did not speak with me thereafter.

(Raftas Decl. 5.)  He continues, "Given my impression of Ms. Billow's attitude toward men, I am not surprised to learn that she terminated Mr. Andersen while retaining the other Human Resources Business Partners and Ms. Palopoli, all of whom were female." (*Id.*)

reclassification of plaintiff's position and there was no plausible link between plaintiff's race or sex and the alleged negative action toward plaintiff).

Plaintiff asserts that Billow violated Defendants' RIF Policy in various respects. He claims that Billow was required to use a reduction review team and consult with another human resources professional, pursuant to Defendants' RIF Policy, but Billow did not do so. (Pl.'s Resp. 40.) She also failed to consider Plaintiff's longevity with the company in considering which employee to terminate. (*Id.* at 44.) However, any such failure does not necessarily undermine Defendants' justification for eliminating Plaintiff's position. A violation of an employment policy itself is not evidence of pretext. *See Russell*, 2006 WL 2077010, at *3.

The facts of this case are similar to the facts of *Bernstein v. St. Paul Companies, Inc.*, 134 F. Supp. 2d 730 (D. Md. 2001). In *Bernstein*, the plaintiff was a white male former employee. His employer was acquired by another company, which resulted in the elimination of redundant jobs in an effort to save overhead costs. *Id.* at 731. Before the acquisition, the plaintiff worked in the legal department of the acquired company and spent half of his time on insurance coverage issues, and half of his time on governmental affairs. In his reviews, he received high marks for his intellect and ability to analyze legal questions, but there were concerns over his interpersonal skills. *Id.* The plaintiff's position with the acquired company was eliminated. *Id.* at 732. Pursuant to reduction-in-staff procedures, he was given the opportunity to "compete" for a Federal Affairs Representative position, which was also being applied for by another applicant, from the acquiring company. This applicant was female and African-American. *Id.* She had become a Federal Affairs Representative for the acquiring company several months before the acquisition and received positive reviews from that company's CEO.

-40-

After the merger, the person to whom the open Federal Affairs Representative would report ("supervisor") compared the two candidates. She interviewed the plaintiff and spoke with his supervisors at his old employer (the acquired company). Their views confirmed the supervisor's own view: that he had excellent research skills but weaker interpersonal skills. *Id.* The female applicant had reported to the supervisor for several months before the competition for the Federal Affairs Representative position. The supervisor believed the female applicant performed well and had the CEO's approval. She decided to retain the female candidate and terminate the plaintiff. She explained that the female applicant was offered the position because of her superior interpersonal skills and her satisfactory performance as the incumbent. She was the "stronger candidate." *Id.* at 733.

The plaintiff exhausted his administrative remedies, and then filed a lawsuit alleging, among other claims, reverse gender discrimination. He contended that his objective qualifications (legal ability, knowledge of insurance law, and lobbying experience) were superior to the female applicant's. He argued that the employer preferred the female applicant because she was a younger (under age forty), African-American female, and he was an older (mid-50's), white male with a disability. He pointed out a speech given by the CEO that (1) he did not want the company to consist exclusively of white men, and (2) he would base part of his managers' bonuses on their success in supporting "diversity." *Id.* at 732.

While the court held that the plaintiff could not make out a *prima facie* case, it held that even if he could make out such a case, the employer proffered a legitimate, nondiscriminatory reason for preferring the female candidate. *Id.* at 733. The court held that the plaintiff failed to come forward with sufficient evidence from which a reasonably minded jury could conclude that

the employer's stated reason for preferring the female candidate was "just a pretext for discrimination." *Id.* (citation omitted).  It explained that it was "uncontroverted" that the position demanded someone with considerable interpersonal skills, and the plaintiff had consistently been marked down in that area.  *Id.*  It explained that the employer's commitment to diversity did not itself raise an inference that the company had a policy of illegal discrimination.

In the instant case, Billow needed to eliminate a position in Allentown.  She chose to eliminate Plaintiff's position and have Palopoli assume his minor day-to-day human resources duties, and any remaining strategic human resources duties would go to another more experienced HRBP, Sholl.  While Plaintiff argues that he had a stronger background in human resources, he does not deny that Palopoli had superior labor relations skills.  While Plaintiff's human resources duties could easily be picked up by Palopoli and Sholl without additional training and time to learn, Plaintiff would have needed additional time and training to learn labor relations skills.  Companies are permitted to make business decisions which result in the retention of one employee and the termination of another employee for any reason that is not predicated upon an impermissible factor.  That is what happened here.  This Court may not now "sit as a kind of super-personnel department that reexamines [Defendant's] business decisions." *Thomas Jefferson Univ.*, 2006 WL 1887984, at *5 (quoting *McCoy v. WGN Cont'l Broad Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).  Accordingly, we will grant Defendants' Motion on Plaintiff's gender discrimination claims.

**IV.      CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted.

An appropriate Order follows.


                                             **BY THE COURT:**


                                             _____
                                             **R. BARCLAY SURRICK, J.**